IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DOUGLAS HOULE,
        Petitioner,

v.                                              Case No.  3:09cv106/LC/CJK

KENNETH S. TUCKER,[1]
        Respondent.

_____

ORDER and
<u>REPORT AND RECOMMENDATION</u>

        Before the Court is an amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254.  (Doc. 9).  Respondent filed an answer, submitting relevant portions of the state court record. (Doc. 19). Petitioner has replied.  (Doc. 23).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).   After careful consideration of all issues raised by petitioner, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter.  Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  The undersigned further concludes that the pleadings and attachments before the Court show that petitioner is not entitled to federal habeas relief, and that the amended petition should be denied.

BACKGROUND AND PROCEDURAL HISTORY

        On April 12, 2006, petitioner was found guilty by jury verdict of first degree

_____

        [1]Kenneth S. Tucker succeeded Edwin G. Buss as Secretary of the Florida Department of Corrections, and is automatically substituted as the respondent.  Fed.R.Civ.P. 25(d).

premeditated murder of his wife, Julie Lynn Houle.  (Doc. 19, Ex. C, p. 141).[2]
Petitioner was adjudicated guilty and sentenced to life in prison without the
possibility of parole.  (*Id.*, pp. 144-51).  Judgment was rendered April 12, 2006.  (*Id.*,
p. 144).   The Florida First District Court of Appeal ("First DCA") per curiam
affirmed without written opinion.  *Houle v. State*, 989 So.2d 641 (Fla. 1st DCA 2008)
(Table) (copy at Ex. L).

Petitioner filed his federal habeas petition in this Court on February 16, 2009,
which he later amended.  (Docs. 1, 9, respectively).  Petitioner's amended petition
raises three grounds for relief:  (1) the trial judge, who was biased, deprived petitioner
of his constitutional rights to present a defense and to confront the evidence against
him by restricting defense counsel's opening and closing statements, cross-
examination of witnesses, and presentation of evidence; (2) the trial court erred by
denying petitioner's motion for judgment of acquittal; and (3) the trial court erred by
denying petitioner's motion to disqualify the judge for an alleged conflict of interest.
(Doc. 9, pp. 4-20).[3]  Respondent argues petitioner's claims are procedurally defaulted
for the following reason:

> The gravamen of [petitioner's] argument on state direct appeal was that
> the trial court did not permit him to present evidence that the victim was
> suicidal in the absence of any evidence that suicide was the cause of
> death, which, Petitioner claimed, deprived him of his defense.  (Ex. G).
> The argument that Petitioner presents here, relating to the alleged bias
> of the trial judge and the denial of his motion for judgment of acquittal,
> were never presented to the state appellate court as error on direct
> appeal.   Accordingly, Petitioner's claims are all unexhausted and,

---

[2]Hereafter, all references to exhibits are to those provided at Doc. 19, unless otherwise noted.

[3]References to page numbers of the amended petition are to those appearing on the Court's
electronic docketing system.

because Petitioner cannot now file a second direct appeal, procedurally barred.

(Doc. 19, p. 11) (footnote omitted).  Petitioner responds that he exhausted all of his claims by raising them on direct appeal.  (Doc. 9, p. 3; Doc. 23, pp. 2-4).

## EXHAUSTION AND PROCEDURAL DEFAULT

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all available state court remedies for challenging his conviction, 28 U.S.C. § 2254(b)(1),[4] thereby giving the state the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of his claim.  *Duncan*, *supra*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct.

---

[4]Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

    (A)  the applicant has exhausted the remedies available in the courts of the State; or

    (B) (i)  there is an absence of available State corrective process; or

      (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

1728, 144 L. Ed. 2d 1 (1999); *Picard*, 404 U.S. at 277-78.

A claim that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review.  *O'Sullivan*, 526 U.S. at 839-40, 848, 119 S.Ct. at 1734; *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11ᵗʰ Cir. 1999); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11ᵗʰ Cir. 1998) (holding that federal habeas courts should enforce applicable state procedural bars even as to claims that were never presented to the state courts).  A claim is also considered procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11ᵗʰ Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts.").  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  *Bailey*, 172 F.3d at 1303.  In the second instance, the federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).

To overcome a procedural default, the petitioner must show cause and prejudice, or a fundamental miscarriage of justice.  *Tower v. Phillips*, 7 F.3d 206, 210 (11ᵗʰ Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11ᵗʰ Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable

unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)).   To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).   "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327.   Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.   To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.

*Id*.

The state court record demonstrates that petitioner's trial counsel filed a notice of appeal accompanied by a statement of judicial acts to be reviewed.   (Ex. C, pp. 157-58).   The statement identified the following acts:

> 1)  In opening statements, Defense Counsel was not allowed to make reference to suicide or any alternative theories regarding cause of death.

> 2)  Defense counsel was not allowed to mention other drugs in the victim's system such as the anti-depressants, which point to depression/suicide.

> 3)  Defense Counsel was not allowed to mention the toxicology results regarding antidepressants in the direct examination of Dr. Goldberger.

4) Any testimony regarding suicide from Alfida Houle was not allowed.

5)  Testimony by Deputy Rikki Barefield that the alleged victim had faked her injury in the past (choking) was not allowed.

6)  During closing arguments, Defense Counsel was limited to the state meeting its burden regarding causation and not allowed to argue alternate theories of death.

7)  Denial of the Motion for Judgment of Acquittal.

8)  Denial of the Motion to Disqualify the judge.

(*Id*., p. 157).  Petitioner's appellate counsel did not brief all the judicial acts trial counsel designated.  Appellate counsel briefed only one issue:

> THE TRIAL COURT ERRED WHEN IT DEPRIVED APPELLANT OF HIS RIGHT TO PRESENT A DEFENSE TO THE CHARGES AGAINST HIM, AND IN DOING SO, ALSO DEPRIVED HIM OF EFFECTIVE COUNSEL

(Ex. G, p. I).  Appellate counsel summarized the issue as follows:

> Mr. Houle's theory of defense was that Julie Houle had either accidentally overdosed on Fentanyl, that she had been depressed and deliberately overdosed on the drug while making it look like Mr. Houle had choked her, or that she had been choked but not killed by Mr. Houle and then either accidentally or deliberately overdosed.  The trial court severely limited Mr. Houle's right to present a defense under the Sixth and Fourteenth Amendment, of the United States Constitution, and Article I, Section 16, of the Florida Constitution.  Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038 (1973).  Essentially the judge told trial counsel the defense must be proven to her before she would allow the jury to hear it.  Mr. Houle was deprived not only of his right to present a defense but also of his due process rights under the Fifth and Fourteenth Amendments, of the United States Constitution, and Article I, Section 9, of the Florida Constitution.

(Ex. G, p. 23).  In the body of petitioner's brief, appellate counsel argued that petitioner was denied his rights to present his defense, engage in meaningful cross-examination and have a fair trial due to the trial court's limitation of defense counsel's opening and closing arguments (Judicial Acts 1 and 6), exclusion of the toxicology results regarding antidepressants (Judicial Acts 2 and 3), limitation of defense counsel's cross-examination of Dr. Minyard, and exclusion of the testimony of Alfreda Houle and Deputy Ricky Barefield (Judicial Acts 4 and 5).  (Ex. G, pp. 25-48).  Petitioner's amended federal habeas petition raises the same issues and makes essentially the same arguments, except that petitioner adds that the trial judge's rulings were motivated by bias.  The "bias" aspect of petitioner's claim was not presented in his direct appeal brief, is now procedurally defaulted, and will not be addressed here.  The Court will, however, address petitioner's remaining arguments that the trial court's evidentiary rulings deprived petitioner of his rights to present a defense and confront the evidence against him.

With regard to Grounds 2 and 3 of the amended petition, respondent is correct that the issues of the denial of petitioner's motions for judgment of acquittal and for disqualification of the judge were abandoned on direct appeal when they were not raised or addressed in petitioner's appellate brief.  In Florida, a claim is raised in the appellate court by the appellant's initial brief, not by the statement of judicial acts to be reviewed. *Simon v. State*, 793 So.2d 980, 981 (2d DCA 2001) (holding that claim designated in defendant's statement of judicial acts to be reviewed on direct appeal, but not raised in defendant's initial brief, were not raised or addressed in defendant's direct appeal); *see also Clark v. State*, 898 So.2d 1008 (Fla. 2d DCA 2005) (holding that statement of judicial acts to be reviewed was not sufficient to demonstrate what

issues were in fact raised on appeal, for purposes of determining whether defendant was procedurally barred from raising issue in postconviction motion); *White v. State*, 977 So.2d 680, 681 (Fla. 1st DCA 2008) (explaining that claims cited in the statement of judicial acts, but not argued in the direct appeal brief, are not considered by the appellate court); *see also* 3 Fla. Jur 2d Appellate Review § 189 (2011) (explaining the purpose of the statement of judicial acts to be reviewed: "if the clerk is directed [by the appellant] to transmit less than the entire record on appeal, the appellant is required to serve with such direction a statement of the judicial acts to be reviewed. <u>This statement is to allow the opposing party to determine whether additional portions of the record are required</u>." (emphasis added)).  Any future attempt by petitioner to raise the JOA and disqualification issues would be barred by Florida's well-established procedural rule that claims which could have been raised on direct appeal but were not, are procedurally barred.  *See Sims v. Singletary*, 155 F.3d 1297, 1314 (11th Cir. 1998) (Florida prisoner's claim that was not, but could have been, raised on direct appeal was procedurally barred); *see also, e.g.*, *Bryant v. McNeil*, No. 4:08cv349/MP/WCS, 2010 WL 5499423, at *3 (N.D. Fla. Nov. 23, 2010) (concluding that state postconviction court "was wrong" in finding double jeopardy claim procedurally barred as having been raised and rejected on direct appeal – although double jeopardy claim was identified in the statement of judicial acts to be reviewed, it was not argued in petitioner's direct appeal brief and therefore was not properly raised in the appellate court), *Report and Recommendation adopted*, 2011 WL 30306 (N.D. Fla. Jan. 3, 2011); *Durain v. McNeil*, No. 2:03cv24, 2008 WL 4888989, at *9 (M.D. Fla. Nov. 12, 2008) (holding that three claims were not "fairly presented" to the state courts and were procedurally barred from federal habeas

review – although the claims were designated in petitioner's statement of judicial acts to be reviewed in postconviction appeal, petitioner failed to argue them in his appellate brief).  Petitioner has made none of the requisite showings to excuse his default.  Accordingly, federal habeas review of Grounds 2 and 3 is procedurally barred.

MERITS REVIEW OF GROUND ONE

The Court will review Ground 1 under § 2254(d).  The record is sufficient to enable review, as respondent has provided a complete copy of the record before the state appellate court.  Although respondent has not argued the merits and instead awaited a ruling on his procedural arguments, the undersigned has reached a recommendation without further briefing by respondent.  If respondent disagrees, or desires the District Judge to consider additional arguments, he may present those arguments in his objections to this Report and Recommendation.  Petitioner, of course, may file objections to the Report and Recommendation as well.

<u>Standard of Review</u>

Federal courts may issue habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. Section 2254(d) provides, in relevant part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (2006).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[5] The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court

---

[5]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and – except as to the footnote – Scalia) in part II (529 U.S. at 403-13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

decision embodies the legal principle at issue. *Thaler v. Haynes*, — U.S. —, 130 S. Ct. 1171, 1173, 175 L. Ed. 2d 1003 (2010); *Bowles v. Sec'y for Dep't of Corr.*, 608 F.3d 1313, 1315 (11th Cir. 2010).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007).

If the state court decision is not contrary to clearly established federal law, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737-38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n. 4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether

its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  A state court, however, may "decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]" without running afoul of the "unreasonable application" clause. *Knowles v. Mirzayance*, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251 (2009).

When faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See Gill v. Mecusker*, 633 F.3d 1272, 1287 (11th Cir. 2011) (citing *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011)).  The federal court  must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior Supreme Court decision.  *See Richter*, 131 S. Ct. at 786; *see also Gill*, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).  In sum, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the

claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill*, 633 F.3d at 1292.

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g., Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and §2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit recently

declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. 930, 127 S. Ct. 2842, 2858. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 131 S. Ct. at 786.

Within this framework, the court will review petitioner's claim.

Analysis

In support of Ground 1, petitioner asserts:

> The Petitioner will show in the following statement of fact (1) he was denied his right to a fair trial by an unbiased judge/jury, (2) due to a "conflict of interest" by the trial judge, who abandoned her roll [sic] an [sic] an unbiased arbiter [sic] and clearly aided and assisted the prosecution arbitrarily denied motions by the defense contrary to rules and standards established by the U.S. Supreme Court. Granted Motions presented by the state that stripped defense counsel of her ability to conduct an adequate defense. Thus resulting in a "manifest miscarriage of justice."

(Doc. 9, p. 4). Petitioner identifies six judicial rulings that allegedly deprived him of his constitutinal rights. The rulings are the same ones discussed above as argued in

petitioner's direct appeal brief.  Petitioner's arguments here mirror those of his appellate brief.  (Doc. 9, pp. 4-12).  The state appellate court summarily affirmed petitioner's conviction without written opinion.

> A.    Clearly Established Federal Law

> > i.    Right to Due Process and Compulsory Process

In *Crane v. Kentucky*, 476 U.S. 683, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986), the Supreme Court held that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Id*. at 690, 106 S. Ct. 2142 (citations omitted); *see also Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); *id*. ("The right to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."); *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923, 18 L. Ed. 2d 1019 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense. . . . This right is a fundamental element of due process of law.").

The Supreme Court makes clear, however, that the right to present a "complete" defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions.  *Chambers v. Mississippi*, 410 U.S. at 295, 93 S. Ct. 1038 (holding that the right to present a defense is not unlimited, and must bow to "other legitimate interests in the criminal trial process" ); *Holmes v. South Carolina*, 547 U.S. 319, 326, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) ("[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is

outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."); *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (holding that a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").   Rather, a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302, 93 S. Ct. 1038.

  ii. Right to Confrontation

  The Sixth Amendment guarantees the criminal defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  Through the Fourteenth Amendment, this "bedrock procedural guarantee" applies to state prosecutions. *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).   At the core of the Confrontation Clause is the right of every defendant to test the credibility of witnesses through cross-examination.  *See Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). Cross-examination is more than a desirable rule of trial procedure; rather, it is the "principal means by which the believability of a witness and the truth of his testimony are tested." *Id.*, 415 U.S. at 316, 94 S. Ct. 1105; *see also Chambers*, 410 U.S. at 295, 93 S. Ct. 1038; *Pointer v. Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

  The right to cross-examine is not, however, absolute.  *Chambers*, 410 U.S. at 295, 93 S. Ct. at 1046.  The Supreme Court has acknowledged that the right to confrontation may, "in appropriate cases, bow to accommodate other legitimate

interests in the criminal trial process," *Chambers*, 410 U.S. at 295, 93 S. Ct. at 1046; *Michigan v. Lucas*, 500 U.S. at 149, 111 S. Ct. 1743. Thus, a trial court has discretion to restrict the scope of cross-examination. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). This includes discretion to impose limits based on concerns about harassment, prejudice, confusion of the issues, witness safety, or interrogation that is repetitive or only marginally relevant. *See id.* In this way, the Confrontation Clause "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) (emphasis in original).

B.     Federal Review of State Court Decision

i.     State Court Record

Petitioner's theory of defense was that the cause of Ms. Houle's death was an overdose of Fentanyl. Petitioner theorized that the circumstances surrounding the overdose were that either Ms. Houle accidentally overdosed on Fentanyl, or Ms. Houle was depressed and deliberately overdosed on Fentanyl while making it look like petitioner had choked her, or Ms. Houle was choked but not killed by petitioner and then either accidentally or deliberately overdosed. (*See* Ex. G, p. 24). Petitioner sought to advance this defense by introducing: (1) the toxicology results from Ms. Houle's autopsy showing that Fentanyl and antidepressants were found in Ms. Houle's system, (2) testimony that Ms. Houle was suicidal, (3) testimony that Ms. Houle was depressed, and (4) testimony that approximately three months before Ms. Houle's death, Ms. Houle made an uncorroborated report that petitioner choked her. Prior to trial, the State filed a Motion in Limine #3 to prohibit the defense from

commenting on the toxicology results from Ms. Houle's autopsy. (Ex. C, pp. 127-28). During argument on the motion, the State argued that Dr. Minyard, the medical examiner, would testify that the cause of death was strangulation. (Ex. D, pp. 77-78). The prosecutor told the judge that Dr. Minyard received information from a toxicologist (Dr. Goldberger) that a Fentanyl overdose could be caused by as little as 3 nanograms to as much as 28 nanograms per milliliter, and that Dr. Minyard still concluded that Ms. Houle died of strangulation based upon the physical findings at the autopsy. (*Id.*, pp. 78-79). The prosecutor claimed that neither Dr. Minyard nor Dr. Goldberger would testify that Fentanyl overdose was the cause of Ms. Houle's death. (*Id.*, p. 79). The defense disputed Dr. Minyard's conclusion that Fentanyl overdose could not possibly be the cause of death, and argued that the State was trying to alleviate itself from its burden of proving causation, and trying to prevent the defense from presenting its case and engaging in meaningful cross-examination. (*Id.*, pp. 79-80). The judge told the defense:

> Well, here is the thing, Ms. Cashwell [defense counsel]. Whether you elicit the testimony from Dr. Minyard or you put it on – although, obviously, your client doesn't have to put on any evidence. Mr. Molchan [prosecutor] has made a proffer that there is not a state witness and he is not aware of a defense witness who will testify that these drugs either caused or contributed to the death of the victim.

> Before I'm going to let you put that in front of a jury, I need to know that there is medical testimony. It's not just we are going to make up some sort of a medical theory here and that's our theory and we don't have something to support it. There has to be expert opinion to support your theory.

> If you are going to go with the idea that reasonable doubt is created because the Fentanyl caused or contributed to the death, there is

going to have to be some medical opinion behind it.  It can't be just your
cross-examination where an expert – if Mr. Molchan's proffer is correct,
Dr. Minyard is going to say that did not cause or contribute to the death.

(*Id.*, pp. 80-81).  The judge further explained:

If Dr. Goldberg is going to say that it's possible that the Fentanyl
level contributed to or caused the death of the victim in the case, okay.
But if Dr. Goldberger is not going to say it's possible, and I don't' think
Dr. Minyard is going to say it, I assume, like I said, you can't throw out
theories and throw out medical things and then not have somebody who
is going to at least say it's possible, is my point.

(*Id.*, p. 82).  Defense counsel argued:

Well, I think what we are doing right now is determining facts
without the jury being present and determining, you know, what will and
will not be argued.  I think what is more appropriate is to find out what
facts come off the stand, and then the attorneys confine themselves to
those facts.

(*Id.*).  The trial court concluded:  "My ruling is . . . that the only way you get to go

into those matters is if you are going to, one way or another, through the state

witnesses or through defense witnesses, put testimony in front of the jury that

supports that it's a possibility that caused or contributed to.  If you do that, I'm going

to deny the State's motion in limine and go forward with it.  If you don't do it, we are

gong to have a problem at the end of the case."  (*Id.*, p. 90).

The following morning before the jury was brought in, the trial judge clarified

her ruling:

I gave some more thought to [the State's] motion, which is
actually motion in limine No. 3, which references this whole issue of
toxicology results from victim's autopsy.  And I think – there's several
layers to this, in my mind, now that I've had a little bit more time to
think about it.

The first is, Ms. Cashwell, in your opening, if you choose to make an opening, I don't want you to make any reference to – since I don't know exactly what your defense is, I'm kind of having to do some broad brush strokes here.

. . . .

No reference to suicide, no reference to accidental death, no reference to the toxicology results in opening.

. . . .

When we get to Dr. Minyard – I'm sure [the prosecutor is] calling Dr. Minyard  – I'd appreciate it if you would ask, on your cross-examination, all questions that you can prior to the toxicology aspect, and then tell me – meaning – when I say "toxicology," I mean the other drugs that were in her system.  I assume you are going to ask Dr. Minyard what other drugs – either Dr. Minyard or somebody has these results of the pathologist's report.  But if you are planning on asking Dr. Minyard about those results, that she had the  – and I don't have my notes – the different drugs in her system that we talked about yesterday that were antidepressants, that you then just approach, and I'm going to send the jury out and I'm going to let you do a proffer on that.  And if you plan to try to impeach Dr. Minyard with an authoritative text, we'll do that all in the way of a proffer first.

. . . .

That, to me, and I'm outlining this so you understand my thought process, has to do with the question of whether the State can meet its burden on causation.  It is the State's burden to meet – beyond a reasonable doubt, prove causation.  I'm sure you know, Ms. Cashwell, from reviewing Ehrhardt, if you decide to go the authoritative text avenue, that that's not substantive evidence.  It's just a cross – it's an impeachment tool.

So if we get to Dr. Minyard, I'd ask that you would – try to do everything you can, and if we get to a point you need to do a proffer pertaining to the other drugs in her system and whether you're going to challenge the cause of death based on those other drugs, we'll do it outside the presence of the jury first. That, to me, is causation: Can the State prove it beyond a reasonable doubt? And I'll make a ruling as to whether you can do that in front of the jury.

But then there's another issue, and this is the second layer, and that is – again, I don't know exactly what your theory is. At some point, I'm going to have to find out what it is. But suicide, accidental death, in order for you to argue suicide or accidental death, it is this Court's position that you are going to have to put on substantive evidence.

You can certainly argue, if we get – depending on what happens with Dr. Minyard, if you impeach her, that they didn't meet their burden on causation, but before you can even get into suicide – and again, I don't know if that's your theory, but if it is, or if it was just that she was on some drugs and she passed out and the defendant was trying to shake her to wake her up – I don't know – in order to establish that, you're going to have to have actual expert testimony that establishes what we talked about yesterday, that there is a possibility that these drugs in her system caused or contributed to her death.

(*Id.*, pp. 97-101).

On direct examination, prosecution witness Dr. Andrea Minyard testified that she performed the autopsy on Ms. Houle's body. (*Id.*, p. 160). Dr. Minyard found bruises on Ms. Houle's neck and petechial hemorrhages on Ms. Houle's face, eyes, and the buccal surfaces of her mouth inside her lips. (*Id.*, p. 161). Dr. Minyard showed a photograph of Ms. Houle's neck and described a thin bruise caused by the pressure of a necklace that was around Ms. Houle's neck. Dr. Minyard stated that, in her opinion, the bruise would have been caused by a lot of pressure pulling on the necklace or pushing against the necklace. (*Id.*, p. 162). Dr. Minyard testified that

petechial hemorrhages on the back of Ms. Houle's neck are indicative of some kind of blunt-force trauma, not necessarily that she was hit over the neck with something, but that there was some pressure and some force that caused the bruises. (*Id.*, p. 163).

Dr. Minyard testified that petechiae are caused when:

> there has been pressure applied to the neck such that blood is able to enter into the head by way of the deeper arteries, but it's not able to exit the head by way of the more superficial veins. So what you have is, you have an engorgement of the head with blood, because blood is being pumped up but it's not going back. So the tiny blood vessels in the face and in the eyes and in the mouth will break with that pressure of the engorgement of the blood, and that is what causes those petechial hemorrhages.

(*Id.*, p. 164). Dr. Minyard also testified that the internal examination of Ms. Houle revealed bruises on the undersurface of the scalp on both sides of her head, bruises on the left side of her tongue and bruises on the thyroid gland. (*Id.*, p. 168). The bruises on Ms. Houle's tongue were consistent with her biting her tongue. Dr. Minyard noted that when a person is strangled, because their jaw is being forced upward, the force can cause the victim to bite his or her tongue. (*Id.*, p. 169). Dr. Minyard testified that there were also bruises in the deep muscle of the back of Ms. Houle's neck and deep contusions of the left side and front of the neck. (*Id.*, p. 169). Dr. Minyard testified that Ms. Houle's injuries were consistent with strangulation. (*Id.*, p. 170). Dr. Minyard's opinion was that the cause of Julie Houle's death was strangulation. (*Id.*). Dr. Minyard added that in most cases of strangulation, because of the struggle that occurs, the pressure on the neck is not complete. It therefore takes longer than a few seconds to kill someone. Dr. Minyard stated that generally a person will fall unconscious before dying and more pressure has to be applied to cause the individual to die. (*Id.*, p. 173).

On cross-examination, Dr. Minyard testified that she could not say whether the bruises on Ms. Houle's scalp were made at the same time as the bruises on her neck. (*Id.*, pp. 175-76). Petechiae of the skin could be seen in cases that did not involve strangulation to the neck, although it was not common. Petechiae of the eyes are not commonly seen outside of strangulation cases. (*Id.*, pp. 176-78). The presence of petechiae, alone, do not prove that strangulation occurred. Common features of strangulation are the breaking of the hyoid bone and fracture of the laryngeal cartilage, but they do not always break. Ms. Houle's hyoid bone and laryngeal cartilage were not broken. (*Id.*, pp. 182-83). Dr. Minyard further testified that Ms. Houle's death was caused by obstruction of the venous blood flow to the brain, thus depriving the brain of oxygen. Deprivation of oxygen to the brain can occur in several ways. Strangulation by obstruction of venous blood flow requires the least amount of pressure. Veins are just beneath the skin and muscles, so less pressure is needed to stop the flow of blood. (*Id.*, pp. 183-87). Dr. Minyard clarified that although less pressure is required to stop venous blood flow than arterial blood flow, "It's not slight pressure in that you just barely touch the skin. It's pressure, and enough pressure to cause bruising to the neck." (*Id.*, p. 187). Dr. Minyard weighed Ms. Houle's lungs and found they were 800 and 620 grams. The normal weight of a lung can be as high as in the 500 grams. Dr. Minyard said the enlarged size of Ms. Houle's lungs did not raise any "red flags." (*Id.*, pp. 191-92). Dr. Minyard testified that "heavy lungs can be due to several different things." (*Id.*, p. 192). Dr. Minyard found frothy liquid in Ms. Houle's bronchi. When asked if these were signs of pulmonary edema, Dr. Minyard responded yes. (*Id.*, pp. 192-93).

With the jury out of the courtroom, defense counsel proffered cross-

examination testimony from Dr. Minyard concerning Fentanyl and the level of Fentanyl found in Ms. Houle's system. The court ruled the testimony could come in.

With the jury present, Dr. Minyard testified on cross-examination that a Duragesic patch on Ms. Houle's left shoulder released 50 micrograms of Fentanyl into her system. There was a sticky residue on another area of Ms. Houle's left shoulder consistent with another Duragesic patch having been worn. Ms. Houle had a prescription from Dr. Reyes for the patches. The patch was to be changed every 72 hours. (*Id.*, p. 205). Dr. Minyard testified that Fentanyl was an opiate which affected the respiratory centers of the brain, and that in lethal amounts Fentanyl could result in respiratory failure. Dr. Minyard sent a blood sample to Dr. Goldberger, a toxicologist, to do a comprehensive drug screen, which Dr. Minyard thought would include Fentanyl. It did not, so Dr. Minyard later ordered a test for Fentanyl. (*Id.*, pp. 205-08). The test for Fentanyl was ordered 2 years after the original blood screen.

Dr. Minyard testified that the Physicians Desk Reference (PDR) was an encyclopedia of drugs and considered an authoritative text. Dr. Minyard did not consult the PDR after seeing the Duragesic patch for releasing Fentanyl. (*Id.*, p. 209). Dr. Minyard said fatal overdose from Fentanyl can occur in cases where there are as little as 3 nanograms up to 28 nanograms per milliliter present. (*Id.*, pp. 209-210). Ms. Houle had 5.4 nanograms per milliliter in her system. Dr. Minyard did not do any research on Fentanyl before releasing her autopsy findings. Dr. Minyard did not request Ms. Houle's medical records until two years after Minyard released her autopsy findings. (*Id.*, p. 210). Dr. Minyard acknowledged that the PDR warned that doses over 25 micrograms per hour should only be given to patients who were tolerant of opiates. This was because Fentanyl could cause respiratory failure. No

other opiates were found in Ms. Houle's system.  (*Id.*, p. 211).

On re-direct examination, Dr. Minyard testified:  "A person who is on Fentanyl for awhile, like Julie Houle, she can have a higher level of Fentanyl in her system without it causing her to die.  It's called tolerance to the drug."  (*Id.*, p. 211). Minyard also testified that postmortem levels are not accurate measurements.  Dr. Minyard pointed out that it is the whole autopsy that you put together to come up with a cause and manner of death.  (*Id.*, p. 212).  The Fentanyl patch did not cause the bruises to the outside of Ms. Houle's neck.  The patch did not cause the bruises to the inside of Ms. Houle's neck.  The patch did not cause the bruise to Ms. Houle's thyroid or cause Ms. Houle to bite her tongue.  The patch did not cause the petechial hemorrhages on Ms. Houle's face, eyes, or the buccal surfaces of her mouth.  All of those bruises were indicative of a strangulation death.  (*Id.*, pp. 212-13).  When asked, "To a reasonable degree of medical certainty, doctor, is the cause of death – what is the cause of death of Julie Lynn Houle?"  (*Id.*, p. 213).  Dr. Minyard responded, "Cause of death is strangulation."  (*Id.*).

The State called Diane Gaines, petitioner's sister.  (*Id.*, p. 228).  Ms. Gaines testified that petitioner called her at about 10:20 p.m. on July 19, 2004, the evening Ms. Houle died.  Petitioner asked Ms. Gaines to come and get his son, Jacob, because he (petitioner) had killed "her" and was going away for a long time.  (*Id.*, pp. 228-31). Lucien Houle, petitioner's father, testified that he spoke with petitioner by phone the night of July 19, 2004, and petitioner said that he (petitioner) had killed his wife and had called his sister to come and take care of Jacob.  (*Id.*, pp. 236-37).  James Waldrop, a longtime friend of petitioner's, testified that petitioner called him the night of July 19, 2004, and said he (petitioner) had killed his wife.  (*Id.*, pp. 244-46).

At a bench conference, defense counsel told the judge: "Your Honor, the issue that we have is that I want to call Dr. Goldberger, and I want to ask him if he found the antidepressants Effexor or Wellbutrin.  And I will make it clear by asking him 'Did those contribute to cause of death?' And the answer will be 'no.'  Okay.  The purpose for me asking him these questions is to show that she was on antidepressants and that she was depressed at the time of this incident."  (*Id*., pp. 248-49).  The State objected on grounds of relevance.  The judge ruled:  "If that's the reason that it be [sic] offered, I'm not going to ask [sic] allow you to ask the question."  (*Id*., p. 249).  Defense counsel argued:  "Your Honor, there's going to be testimony from Mrs. Houle [petitioner's mother] that that day, Julie Houle said that she wanted to kill herself.  And there's also going to be testimony from Dr. Reyes, who she went and saw to get the prescription for antidepressants, that she was depressed."  (*Id*., p. 249).  The court ruled:

> I indicated we weren't going to get into the suicide theory until there is some expert testimony that the drugs in her system caused or contributed to her death.  If you don't have that, I don't think we're even going to get to the suicide theory.
>
> . . . .
>
> I'm taking it that what you're telling me is going to come out.  And if you've got somebody who is going to say that the antidepressant caused or contributed to or any of the toxicological stuff –

(*Id*., p. 250).    Defense counsel clarified that she was not offering the depression/suicide evidence for purposes of showing cause of death.  "I'm offering for purposes of showing she was depressed . . . and on antidepressants at the time."  (*Id*., pp. 250-51).  The court responded, "Then I'm not going to allow that testimony."

(*Id.*, p. 251).

After the State rested, defense counsel asked the court, at a bench conference, if she could present evidence from Dr. Reyes that he referred Ms. Houle to a psychiatrist and prescribed antidepressants for Ms. Houle.  (*Id.*, p. 278).  The court clarified, "My understanding of why this is being offered is to show that she was depressed, correct?"  (*Id.*).  The following discussion occurred:

> MS. CASHWELL:  Okay.  Is to show that she was depressed and that she had – yeah, and that links in with the statements by Mrs. Houle [petitioner's mother] that she said that she wanted to commit suicide.  And it also links in with a prior incident in which she [Julie Houle] was caught trying to strangle herself, rubbing her neck.
>
> THE COURT:  But I guess my point about all of this, and, Mr. Molchan [prosecutor], jump in, is that if I – you know, at some point, the Defense has to tell me what they're doing, for me to rule.  And other than the theory that she was going to try and commit suicide, there has to be evidence that in this particular time, either the drugs that she was on or something about the mechanism of injury – either the drugs she was on caused or contributed to her death, which she could have taken the drugs and then, therefore, committed suicide accidentally or intentionally killed herself by mechanism injury.  But there has to be something from the Defense on that to actually get that argument to the jury.
>
> As I said this morning, there's a distinction between you saying, "look, the State – I'm going to attack Dr. Minyard's opinion because she's got a problem with causation."  That's a different thing than what you can argue.  And so you have to tell me.  If you have something –
>
> MS. CASHWELL:  Okay.
>
> THE COURT:  – you have to tell me now.
>
> . . . .

MS. CASHWELL:  Here's the Defense' theory.  On April 24th, 2004, the police reported to her house.  She made an allegation that he had choked her.  Okay.  The police officer observed her rubbing her neck, as did Alfreda Houle and Diane Gaines, who was [sic] there as well, saw her rubbing her neck.  And so Defense' theory is that she takes the Duragesic patches not as prescribed, overdoses on it, and prior to overdosing on it, she sets him up for murder by scratching her own neck and by doing the choking.  And there's nothing that the State has proffered thus far, you know, that makes that impossible.

MR. MOLCHAN:  Except the fact, Judge, that you cannot strangle yourself, that you will pass out and go unconscious prior to death occurring.

MS. CASHWELL:  But that's only – but there has been no conclusive evidence that she passed out and then continued to be strangled.  That was why I was asking the questions regarding mechanisms of death and venous engorgement.  In other words, from the medical standpoint, it's not there.

THE COURT:  Well, okay.  So this is clear for the appellate record.

. . . .

I kind of keep repeating myself, but I even have notes.  I totally agree with your position, Ms. Cashwell, that you are free to impeach Dr. Minyard on the issue of cause or manner of death or contribution to death about this Duragesic patch.  That's not substantive evidence.  It's credibility.  And you can say that "It's the State's burden, they didn't meet their burden, I attacked it."  Now, let's clear that off the table.

. . .

Then we move on to what you are trying to do, which is a different thing, which is to say – to propose a theory that she had previously had this experience, whether he choked her or she choked

herself, and that she was setting herself up – or him up, and this is how it went.

    You have – in my opinion, as a trial court judge, you have to – you have to come forward with evidence, some evidence that that is what happened.  You can't just say – throw it up there.  You have to have somebody testify that the cause and manner of her death is consistent with somebody trying to kill themselves.  If you do that, if you have that testimony, then the fact that she was depressed, the fact that she had suicidal ideation or whatever all comes in, but if you don't have anybody that's going to say that, then my position is that none of that comes in front of the jury, because it's not just "Let me throw the idea of suicide out there because I don't have anything."

. . . .

You still have to have somebody come in here and say that her injuries are consistent, could be possibly either the Duragesic or this (demonstrating), and if nobody's going to say that on your side of the case, I doubt – I don't' think Mr. Molchan's going to say it, then I'm denying.  Nothing about suicide, nothing about antidepressants, nothing about that.

(*Id.*, pp. 279-88).

    The defense called Dr. Bruce Goldberger, Professor and Director of Toxicology at the University of Florida in the College of Medicine in the Department of Pathology.  (*Id.*, pp. 290-91).  Dr. Goldberger received vitreous and blood samples from Dr. Minyard.  Dr. Goldberger had done extensive research into Fentanyl.  He testified that Fentanyl had long been used as an IV anesthetic drug in surgery, primarily.  Fentanyl had been available for use by the general public, with a prescription, for about 10 years in a patched called Duragesic.  Researchers started to note an increase in Duragesic-related deaths around the State of Florida, so Dr.

Goldberger had been tracking those deaths.  Dr. Goldberger presented a paper two years before petitioner's trial in which he identified the Duragesic-related deaths as an epidemic.  The FDA issued a warning in June of 2005 that Duragesic should not be used in opiate-naive patients, which meant that patients who had not used opiates, morphine, or codeine should not use Duragesic.  If the patient was not presently on any kind of opiate therapy, then any patch, including the Duragesic, should not be used.  (*Id.*, pp.291-94).  Dr. Goldberger explained:

> Any patch.  See, ordinarily – when the patch came out years ago, the patch could be used for the treatment of moderate to severe pain.  So you could use it in someone who was complaining of back pain, for example, and it was the medication that a physician started with.  But because it was found that some of these patients were overdosing a few days later, the FDA felt that that was not good practice, and it should be used only in opioid-tolerant patients.

(*Id.*, pp. 293-94).  A first test of Ms. Houle's blood showed no opiates.  However, a second test was performed for Fentanyl and it was discovered to be in her system in the amount of 5.4 nanograms per milliliter.  Dr. Minyard did not notify Dr. Goldberger that a Duragesic patch had been found on Ms. Houle's body.  (*Id.*, p. 294).  Dr. Goldberger testified that the typical therapeutic range of Fentanyl in living people was about 1 to 3 nanograms per milliliter.  Dr. Goldberger had seen cases of death where the amount of Fentanyl was below 3 nanograms, as well as cases where it was above 50 nanograms.  (*Id.*, pp. 294-95).  Fentanyl could slow both the breathing rate and the heart rate.  (*Id.*, p. 296).  Even after a Duragesic patch was removed from the skin, the body continued to absorb the drug residue into the bloodstream.  (*Id.*, p. 297).  Dr. Goldberger said the patches should not be used on opioid-naive patients.  Fentanyl should not be prescribed to a person with breathing

problems.   (*Id*., pp. 298-99).   People who overdose on the drug tend to have pulmonary edema or heavy lungs at autopsy.  (*Id*., p. 299).  Dr. Goldberger could not say that the 5.4 nanogram level found in Ms. Houle's blood was accurate because of postmortem drug redistribution.   Dr. Goldberger testified that "Ordinarily, when there's a postmortem change, the numbers do go up.  There are instances when the numbers do go down, but by far, the instances are the numbers going up."  (*Id*., pp. 302-03).  Dr. Goldberger said medical examiners must take the toxological findings and interpret them in the full context of the case.  (*Id*., pp. 300-03).  Dr. Goldberger explained:

> That's why it's important that the medical examiner take my findings, as a toxicologist, in – in full context of the case.  So this, along with the pathology findings and all of the other findings from the case, then a conclusion is made.  You wouldn't want to use – I'm sorry. . . . You wouldn't want to use my findings in a vacuum to make a conclusion.

(*Id*., p. 302).

On cross-examination, Dr. Goldberger acknowledged he was not a physician. Dr. Goldberger said he "always" defers to the medical examiner in coming up with a conclusion regarding cause of death.  (*Id*., p. 304).  When asked, "[Y]ou're not saying that because there's a level of 5.4 nanograms in this sample that was sent to you, that that equates to a drug overdose."  Dr. Goldberger replied, "No, we can't do that, not that way."  (*Id*., p. 305).  Dr. Goldberger testified that Fentanyl does not cause bruising or petechial hemorrhages or cause people to bite their tongues.  (*Id*., p. 306).  When asked, "Based upon the physical findings, you defer to the medical examiner as far as the cause of death?"  (*Id*., pp. 306-07).  Dr. Goldberger responded, "Yes."  (*Id*., p. 307).

The defense called Dr. Reyes.  (*Id*., p. 311).  Dr. Reyes treated Ms. Houle for

back and neck pain from an on-the-job accident.  Dr. Reyes prescribed ten 50-micromgram Duragesic patches to Ms. Houle.  This was a 30-day prescription.  (*Id*., p. 311-14).  Dr. Reyes performed a pulmonary function test on Ms. Houle and found that she had COPD (chronic pulmonary obstruction) as well as the beginning stages or more of emphysema.  When questioned as to whether he asked Ms. Houle if she had taken opiates before, Dr. Reyes said she gave him a list of medications she was taking.  Dr. Reyes prescribed the patch based upon what she told him.  Dr. Reyes requested Ms. Houle's old medical records, but never received them so did not know if Ms. Houle reported truthfully.  (*Id*., pp. 314-16).

Jaime Lee Thompson, a death investigator with the medical examiner's office, testified that she went to Ms. Houle's house and took possession of a prescription for Duragesic patches that was prescribed to Julie Lynn Houle.  The prescription was from Dr. Reyes.  The prescription was for ten patches.  There were eight patches left.  Two patches were missing.  (*Id*., pp. 317-20).

After the testimony of another defense witness, the defense proffered testimony of Alfreda Houle, Diana Gaines and Deputy Ricky Barefield which, according to the defense, would show that Julie Houle overdosed on Fentanyl and self-inflicted the marks on her neck in an effort to frame petitioner.  The testimony was proffered outside the presence of the jury.  Alfreda Houle, petitioner's mother, said she had gone shopping with Julie Houle on the day of Ms. Houle's death.  While they were at a restaurant, Julie Houle – referencing a previous time when she told Alfreda Houle she "was gonna go kill herself" – told Alfreda Houle that she "wished she would have done it then."  (*Id*., p. 350).  Alfreda Houle testified that Julie Houle seemed "very depressed" the day they went shopping.  (*Id*.).  The trial court disallowed the

testimony regarding suicide.  (*Id*., p. 351).  Alfreda Houle also testified that she was present during an April 27, 2004 incident where police were called to petitioner and Julie Houle's residence.  Alfreda Houle testified that Julie Houle reported that petitioner tried to choke her.  Alfreda Houle did not observe any choking, or Julie Houle "doing anything with her neck." (*Id*., pp. 350-51).  Diane Gaines testified that she was called to the Houle residence on April 27, 2004.  (*Id*., pp. 352-53).  When Ms. Gaines arrived, Alfreda Houle was there, as well as petitioner's brother, the police, Julie Houle and the Houle's son Jacob.  Julie Houle was sitting in the front yard.  Ms. Gaines asked Julie Houle what happened and Julie reported that petitioner tried to choke her.  Julie Houle was rubbing her neck.  (*Id*., p. 353).  Defense counsel asked Ms. Gaines, "Did she appear to be, as she was rubbing it, making it redder and redder?"  (*Id*.).  Ms. Gaines responded, "I can't – I couldn't – I can't tell you that." (*Id*.).  Escambia County Sheriff's Deputy Ricky Barefield proffered that he responded to the April 27, 2004 call from the Houle residence.  Deputy Barefield made contact with Julie Houle.  Julie Houle alleged that petitioner choked her, and that she grabbed the inside of petitioner's wrist to get away.  (*Id*., p. 354).  Deputy Barefield observed Ms. Houle's neck and did not see any signs of choking such as bruising or finger impressions.  Barefield noticed that Ms. Houle's neck was red, slightly flushed, but did not see any evidence to support Ms. Houle's allegations that she was choked. Deputy Barefield viewed petitioner's wrist and did not observe any marks.  (*Id*., p. 355).  Julie Houle told Deputy Barefield that Alfreda Houle witnessed the incident; however, upon questioning by Deputy Barefield, Alfeda Houle said she heard the argument but did not see anything.  (*Id*.).  During Deputy Barefield's conversation with Julie Houle, Ms. Houle was standing with her arms crossed and one arm at her

neck.  Barefield testified:  "She wasn't rubbing it constantly, just you know, every once in a while."  (*Id*., p. 356).  Deputy Barefield did not arrest petitioner because there was no corroboration of Ms. Houle's story.  (*Id*.).  The trial court disallowed the testimony concerning the April 27, 2004 incident.

Regarding closing arguments, the judge said:

> The way it stands right now, Ms. Cashwell – and again, I'll – is this:  You had – the PDR was an authoritative text that was not evidence.  You did cross-examine, impeach – argue – you're going to argue you impeached Dr. Minyard on the cause of death.  So I think in your closing, you can mention that it's the State's burden on causation, and you can consider the attack that you made on causation as it pertains to Fentanyl.

> I did not hear any testimony or evidence that Fentanyl caused or contributed to the death of the defendant – I mean of the victim or that she committed suicide or any other alternative theory.  I think what you're limited to is the State not meeting its burden on causation.

> . . . .

> . . . I'm going to let my brain cells relax a little bit and I'll think about it.  And like I said, I know you're preparing tonight.  My initial reaction is just you can attack as far as causation, but as far as any substantive evidence, nobody testified for sure that there was anything other than strangulation, and nobody testified no suicide because I didn't allow it.  And Dr. Goldberger could not and did not testify that Fentanyl was the cause or contributed to the death in this case.

(*Id*., pp. 376-78).  The judge confirmed her ruling the following morning.

The State argued during closing arguments that the Fentanyl did not cause or contribute to Ms. Houle's death.  (*Id*., p. 388-89).  Defense counsel argued that the State based its case entirely on the unreliable testimony of Dr. Minyard, and that Ms.

Houle's death was caused by Fentanyl overdose in a body that was already having pulmonary problems.

ii.     Discussion

The state appellate court reasonably could have concluded that petitioner's evidence of antidepressants in Ms. Houle's system, Ms. Houle being depressed or suicidal, and Ms. Houle making an uncorroborated report of petitioner choking her, was not relevant and consequently did not deprive petitioner of a fair trial, the right to present a defense, or the right to confrontation.  Petitioner was allowed to introduce evidence concerning Fentanyl for the purpose of impeaching Dr. Minyard's testimony (to cast doubt on the reliability of Dr. Minyard's opinion that strangulation was the cause of death and raise reasonable doubt about whether the State proved Ms. Houle died of strangulation).  Petitioner's proffered evidence was not relevant to impeach Dr. Minyard's opinion.

Petitioner's Fentanyl evidence was not substantive evidence of cause of death. Petitioner's authoritative text was not substantive evidence, and there was no testimony, proffered or admitted, showing even a possibility that a Fentanyl overdose caused or contributed to Ms. Houle's death.  Thus, petitioner's evidence concerning the circumstances surrounding a theoretical overdose (i.e., whether it was intentional or accidental) was irrelevant and inadmissible as substantive evidence.  The proffered evidence of Ms. Houle's depression, suicidal thoughts and uncorroborated report of being choked had no probative value concerning the cause of death or petitioner's innocence, and would have only served to confuse and mislead the jury.  Petitioner was given ample opportunity to establish the relevance of the excluded evidence, but failed to do so.  Neither due process nor confrontation principles require that a

defendant be allowed to introduce evidence, through direct or cross-examination, that is irrelevant.

The state court's rejection of petitioner's claim was not contrary to, and did not involve an unreasonable application of, clearly established federal law.  Nor was the state court's decision based on an unreasonable determination of the facts.  Petitioner is not entitled to federal habeas relief.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The petitioner in this case fails to make a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining the meaning of this term) (citation omitted).  Therefore, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rule 11(a), Rules Governing Section 2254 Cases.  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and

recommendation.

Accordingly, it is ORDERED:

The clerk shall change the docket to reflect that Kenneth S. Tucker has been substituted as respondent in this cause.

And it is respectfully RECOMMENDED:

1.  That the amended petition for writ of habeas corpus (doc. 9), challenging the conviction and sentence in *State of Florida v. Douglas Lucien Houle* in the Circuit Court for Escambia County, Florida, Case No. 04-CF-3261 be DENIED, and the clerk be directed to close the file.

2.  That a certificate of appealability be DENIED.

At Pensacola, Florida this 30th day of November, 2011.

/s/ *Charles J. Kahn, Jr.*
CHARLES J. KAHN, JR.
UNITED STATES MAGISTRATE JUDGE

NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).